## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MICHAEL GENSEMER, derivatively on behalf of ZOSANO PHARMA CORPORATION, | |
| Plaintiff, | **C.A. No.** |
| vs. | |
| STEVEN LO, JOHN P. WALKER, KONSTANTINOS ALATARIS, STEVEN A. ELMS, LINDA GRAIS, KENNETH R. GREATHOUSE, JOSEPH P. HAGAN, and KLEANTHIS G. XANTHOPOULOS, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| ZOSANO PHARMA CORPORATION, | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Michael Gensemer ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Zosano Pharma Corporation ("Zosano" or the "Company"), files this Verified Shareholder Derivative Complaint against Steven Lo ("Lo"), John P. Walker ("Walker"), Konstantinos Alataris ("Alataris"), Steven A. Elms ("Elms"), Linda Grais ("Grais"), Kenneth R. Greathouse ("Greathouse"), Joseph P. Hagan ("Hagan"), and Kleanthis G. Xanthopoulos ("Xanthopoulos") (collectively, the "Individual Defendants," and together with Zosano, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Zosano, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for

1

contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Zosano, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Zosano's directors and officers from February 13, 2017 through September 30, 2020 (both dates inclusive) (the "Relevant Period").

2.      Incorporated in Delaware and based in Fremont, California, Zosano is a clinical stage biopharmaceutical company that provides rapid systemic administration of therapeutics to patients with its proprietary intracutaneous (under the skin) microneedle system, i.e., an adhesive "patch" that delivers medicine through tiny needles. Each patch contains a collection of titanium microneedles that are coated with a hydrophilic (mixed with water) formulation of a drug. The patch is applied onto the skin, pressing the microneedles to a uniform depth close to the capillary bed, allowing the drug to dissolve and absorb.

3.      Zosano has focused its development efforts on its product candidate, Qtrypta™ (M207) ("Qtrypta"), which is a formulation of the drug zolmitriptan, a migraine treatment. Qtrypta is designed to be coated onto the Company's patch delivery system and quickly absorbed in the

bloodstream, avoiding the gastrointestinal tract (i.e., swallowing the drug). The Company initiated its pivotal efficacy trial of the drug ("ZOTRIP") in July 2016. Zosano submitted its New Drug Application ("NDA") to the U.S. Food and Drug Administration ("FDA") seeking approval of Qtrypta in December 2019.

4.      Throughout the Relevant Period, the Individual Defendants caused the Company to consistently make statements in the Company's SEC filings and press releases that misrepresented the Company's business operations, prospects, and compliance, particularly with respect to regulatory approval of Qtrypta. While the Company's SEC filings purported to accurately disclose, among other things, the Company's expectations of regulatory approval of Qtrypta, the Company was actually achieving varied results in its efficacy trials that would foreseeably delay approval, enabling insiders to unjustly enrich themselves to the detriment of the Company and its shareholders.

5.      The truth began to emerge on September 30, 2020, when Zosano disclosed that it had received a discipline review letter ("DRL") from the FDA, stating that it was not likely to approve the Qtrypta NDA. The Company disclosed in a press release that day that the FDA had "raised questions regarding unexpected high plasma concentrations of zolmitriptan observed in five study subjects from two pharmacokinetic studies and how the data from these subjects affect the overall clinical pharmacology section of the application." Moreover, the FDA "raised questions regarding differences in zolmitriptan exposures observed between subjects receiving different lots of Qtrypta in the company's clinical trials."

6.      On this news, the price of the Company's stock fell $0.92 per share, or almost 57%, from $1.62 per share at the close of trading on September 30, 2020, to $0.70 per share at the close of the next trading day, on October 1, 2020, on unusually heavy trading volume.[1]

7.      Then, a few weeks later, on October 21, 2020, Zosano disclosed that it had received a Complete Response Letter ("CRL") from the FDA, recommending that the Company conduct another bioequivalence study between three of the lots used in developing Qtrypta.

8.      On this news, the Company's share price fell $0.171 per share, or almost 28%, from $0.615 per share at the close of trading on October 20, 2020, to close at $0.444 per share at the close of the next trading day, on October 21, 2020, on unusually heavy trading volume.

9.      During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making or causing the Company to make a series of materially false and/or misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose to investors, *inter alia*, that: (1) the Company's clinical results showed that subjects who received different lots of zolmitriptan had different exposure levels; (2) the Qtrypta NDA reflected that certain patients in the clinical studies had unexpected high plasma concentrations of zolmitriptan; (3) because of these variances in patient results, the FDA was reasonably likely to require further studies of Qtrypta, which would delay regulatory approval of the drug; and (4) the Company failed to maintain internal controls. As a result of the foregoing, Zosano's public statements were materially false and misleading at all relevant times.

---

[1] Stock references herein reflect the price per share of Company stock following Zosano's 1 for 20 reverse stock split, effectuated on January 25, 2018.

10.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

11.     Also in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

12.     In light of the Individual Defendants' misconduct, which has subjected Zosano, the Company's Chief Executive Officer ("CEO"), its Chairman of the Board of Directors (the "Board"), and its former CEO, to being named as defendants in two federal securities fraud class action lawsuits pending in the United States District Court for the Northern District of California (the "Securities Class Actions"),[2] the need to undertake internal investigations, the need to implement adequate internal controls, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

13.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO and Chairman's liability in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Zosano's Board of Directors (the "Board") cannot

---

[2] The parties moved to consolidate the Securities Class Actions on December 28, 2020.

consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

15.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17.     Venue is proper in this District because Zosano is incorporated in this District. In addition, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

18.     Plaintiff is a current shareholder of Zosano. Plaintiff has continuously held Zosano common stock at all relevant times.

### Nominal Defendant Zosano

19.     Zosano is a Delaware corporation with its principal executive offices at 34790 Ardentech Court, Fremont, California 94555. Zosano's shares trade on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "ZSAN."

**Defendant Lo**

20.     Defendant Lo has served as the Company's President and CEO and as a Company director since October 2019.

21.     For the fiscal year ended December 31, 2019, Defendant Lo received $874,638 in compensation from the Company. This included $105,673 in salary, $50,000 in bonus, and $718,965 in option awards.

22.     The Company's Schedule 14A filed with the SEC on May 29, 2020 (the "2020 Proxy Statement") stated the following about Defendant Lo:

> **Steven Lo** has served as our President and Chief Executive Officer and as a member of our Board of Directors since October 2019. Previously, from September 2015 to October 2019, Mr. Lo served as Chief Commercial Officer of Puma Biotechnology, Inc., a publicly-held biopharmaceutical company. Prior to joining Puma, Mr. Lo held a number of positions at Corcept Therapeutics Incorporated, a publicly-held pharmaceutical company, from September 2010 to September 2015, including Senior Vice President, Oncology, Senior Vice President & Chief Commercial Officer and Vice President & Head of Commercial Operations. Prior to Corcept, Mr. Lo was with Genentech, Inc. from December 1997 to September 2010. At Genentech, Mr. Lo held a number of positions, including Senior Director, Oncology Marketing, where he prepared and led the first U.S. launch of Herceptin® in adjuvant HER2-positive breast cancer. His other leadership roles at Genentech included Franchise Head, Endocrinology and Senior Director of Managed Care. Mr. Lo received a B.S. in Microbiology from the University of California, Davis and a Master of Health Administration from the University of Southern California. We believe that Mr. Lo's perspective as our President and Chief Executive Officer qualifies him to serve as a member of our Board of Directors.

**Defendant Walker**

23.     Defendant Walker served as the Company's President and CEO from August 2017 until October 20, 2019 and continued to provide transition services until he retired from his executive positions on November 10, 2019. Defendant Walker has also served as a member of the Board since May 2016, and currently serves as Chairman of the Board. According to the 2020 Proxy Statement, as of May 11, 2020, Defendant Walker beneficially owned 339,555 shares of the Company's common stock. Given that the price per share of the Company's common stock at the

close of trading on May 11, 2020 was $0.888, Defendant Walker owned over $301 thousand worth of Zosano stock.

24.     For the fiscal year ended December 31, 2019, Defendant Walker received $496,051 in compensation from the Company. This included $486,239 in salary and $9,722 in other compensation. For the fiscal year ended December 31, 2018, Defendant Walker received $1,970,982 in compensation from the Company. This included $446,962 in salary, 250,000 in bonus awards, and $1,274,020 in option awards. For the fiscal year ended December 31, 2017, Defendant Walker received $521,123 in compensation from the Company. This included $141,923 in salary, $82,200 in stock awards, $220,710 in option awards, and $76,290 in other compensation.

25.     The Company's 2020 Proxy Statement stated the following about Defendant Walker:

> **John P. Walker** has served as a member of our Board of Directors since May 2016. From August 2017 to October 2019, Mr. Walker served as our President and Chief Executive Officer, and he served as our Interim Chief Executive Officer from May 2017 to August 2017. Mr. Walker has served as Chairman of Vizuri Health Sciences, LLC since March 2016 and Chairman of the Boards of Propella Therapeutics Inc. and Vizuri Health Sciences Consumer Health Inc. since May 2020. He also previously served as a Managing Director of Four Oaks Partners, a life sciences transaction advisory firm, which he co-founded in March 2012, until January 2015. As part of his activities with Four Oaks Partners, Mr. Walker served as the Chairman and Interim Chief Executive Officer of Neuraltus Pharmaceuticals, Inc., a privately held biopharmaceutical company, until October 2013. From February 2009 until July 2010, Mr. Walker was the Chief Executive Officer at iPierian Inc., a company focused on the use of inducible stem cells for drug discovery. From 2006 until 2009, Mr. Walker served as the Chairman and Chief Executive Officer of Novacea, Inc., a pharmaceutical company that merged with Trancept Pharmaceuticals, Inc. in 2009. Since 2001, Mr. Walker, acting as a consultant, was Chairman and Interim Chief Executive Officer at Kai Pharmaceuticals, Guava Technologies, Centaur Pharmaceuticals, Inc., and Chairman and Chief Executive Officer of Bayhill Therapeutics. From 1993 until 2001, Mr. Walker was the Chairman and Chief Executive Officer of Arris Pharmaceuticals Corporation and its successor, Axys Pharmaceuticals Inc. Mr. Walker previously served on the Board of Directors of Geron Corporation and Evotec AG. Mr. Walker currently serves on the Board of Directors of Lucile Packard Children's Hospital at Stanford University, is the Chairman of Packard

Children's Health Alliance, and is a member of the Board of Trustees at the University of Puget Sound. Mr. Walker received a B.A. from the State University of New York at Buffalo and is a graduate of the Advance Executive Program at the Kellogg School of Management at Northwestern University. We believe Mr. Walker's 40 years in the life sciences industry and his experience as Chairman and Chief Executive Officer of a number of development and commercial stage companies, including his prior service as our President and Chief Executive Officer, qualify him to serve as a member of our Board of Directors.

**Defendant Alataris**

26.     Defendant Alataris served as the Company's CEO from January 2016 until May 2017 and as a Company director from February 2016 through May 2017. According to the Company's Schedule 14A filed with the SEC on April 30, 2018 (the "2018 Proxy Statement"), as of April 20, 2018, Defendant Alataris beneficially owned 19,107 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 20, 2018 was $4.24, Defendant Alataris owned over $81 thousand worth of Zosano stock.

27.     For the fiscal year ended December 31, 2017, Defendant Alataris received $462,183 in compensation from the Company. This included $165,998 in salary and $296,185 in other compensation consisting of severance and vacation payments.

**Defendant Elms**

28.     Defendant Elms has served as a member of Zosano's Board since May 2018. Defendant Elms also serves on the Compensation Committee and the Nominating and Corporate Governance Committee. According to the 2020 Proxy Statement, as of May 11, 2020, Defendant Elms beneficially owned 2,732,746 shares of the Company's common stock, which represented 5.0% of the Company's outstanding common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on May 11, 2020 was $0.888, Defendant Elms owned over $2.4 million worth of Zosano stock.

29.     For the fiscal year ended December 31, 2019, Defendant Elms received $47,895 in compensation from the Company. This included $45,002 in fees earned or paid in cash and $2,893 in option awards. For the fiscal year ended December 31, 2018, Defendant Elms received $120,272 in compensation from the Company. This included $28,065 in fees earned or paid in cash and $92,207 in option awards.

30.     The Company's 2020 Proxy Statement stated the following about Defendant Elms:

***Steven A. Elms*** has served as a member of our Board of Directors since May 2018. He currently serves as a Managing Partner of Aisling Capital LLC, a private equity firm. He joined Aisling Capital LLC in 2000 from the life sciences investment banking group of Chase H&Q (formerly Hambrecht and Quist Group Inc.) where he was a principal. Mr. Elms has served on the Board of Directors of ADMA Biologics, Inc., a publicly-held commercial biopharmaceutical company, since July 2007. Previously, Mr. Elms served on the Board of Directors of Loxo Oncology from 2013 to 2019, Ambit Biosciences Corp. from 2001 to 2014, MAP Pharmaceuticals, Inc. from 2004 to 2011 and has served on the boards of directors of a number of private companies. Mr. Elms received a B.A. in Human Biology from Stanford University and a M.B.A. from the Kellogg School of Management at Northwestern University. We believe that Mr. Elms's extensive financial services background and experience in the pharmaceutical and healthcare industries equip him to serve on our Board of Directors.

**Defendant Grais**

31.     Defendant Grais has served as a member of the Company's Board since January 2019. Defendant Grais also serves on the Audit Committee and as Chair of the Nominating and Corporate Governance Committee. According to the 2020 Proxy Statement, as of May 11, 2020, Defendant Grais beneficially owned 8,854 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 11, 2020 was $0.888, Defendant Grais owned nearly $8 thousand worth of Zosano stock.

32.     For the fiscal year ended December 31, 2019, Defendant Grais received $96,192 in compensation from the Company. This included $43,429 in fees earned or paid in cash and $52,763 in option awards.

33.     The Company's 2020 Proxy Statement stated the following about Defendant Grais:

**Linda Grais** has served as a member of our Board of Directors since January 2019. She currently serves on the Board of Directors of Arca Biopharma and Corvus Pharmaceuticals, both publicly-held biopharmaceutical companies, and PRA Health Sciences, a publicly-held contract research organization. From 2012 to 2017, Dr. Grais was President, Chief Executive Officer, and a member of the Board of Directors of Ocera Therapeutics, Inc., a biopharmaceutical company, which was acquired by Mallinckrodt, a pharmaceutical company, in 2017. Prior to her employment by Ocera, Dr. Grais served as a Managing Member at InterWest Partners, a venture capital firm, from 2005 until 2011, investing in biotechnology and medical device companies. From July 1998 to July 2003, Dr. Grais was a founder and executive vice president of SGX Pharmaceuticals Inc., a drug discovery company, which was acquired by Eli Lilly & Co., a pharmaceutical company, in 2008. Prior to that, she worked as an attorney at Wilson Sonsini Goodrich & Rosati, where she represented Life Science companies. Before practicing law, Dr. Grais worked as an assistant clinical professor of Internal Medicine and Critical Care at the University of California, San Francisco. Dr. Grais received a B.A. from Yale University, an M.D. from Yale Medical School and a J.D. from Stanford Law School. We believe that Dr. Grais's extensive experience in the biopharmaceutical industry and as an executive officer of pharmaceutical and biotechnology companies qualifies her to serve as a member of our Board of Directors.

### Defendant Greathouse

34.     Defendant Greathouse has served as a member of the Company's Board since October 2017. Defendant Greathouse also serves on the Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee. According to the 2020 Proxy Statement, as of May 11, 2020, Defendant Greathouse beneficially owned 28,603 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 11, 2020 was $0.888, Defendant Greathouse owned over $25,000 worth of Zosano stock.

35.     For the fiscal year ended December 31, 2019, Defendant Greathouse received $57,895 in compensation from the Company. This included $55,002 in fees earned or paid in cash and $2,893 in option awards. For the fiscal year ended December 31, 2018, Defendant Greathouse received $154,181 in compensation from the Company. This included $49,167 in fees earned or

paid in cash and $105,014 in option awards. For the fiscal year ended December 31, 2017, Defendant Greathouse received $46,056 in compensation from the Company. This included $8,562 in fees earned or paid in cash and $37,494 in option awards.

36.    The Company's 2020 Proxy Statement stated the following about Defendant Greathouse:

> **Kenneth R. Greathouse** has served as a member of our Board of Directors since October 2017. Mr. Greathouse co-founded and has served as President of Argent Development Group since 2004, co-founded and has served as Chief Executive Officer of Melbourne Laboratories since 2012, co-founded and has served as Chief Executive Officer of Valcrest Pharmaceuticals since 2015 and co- founded and has served as Chief Executive Officer of Hesperian BioPharma since 2015. Mr. Greathouse has served as a member of the Board of Directors of Grove Sleep Holdings since 2009 and as a member of the Board of Directors of Optime Care since 2020. Mr. Greathouse received a B.S. from the University of California, Berkeley. We believe that Mr. Greathouse's extensive experience in the pharmaceutical industry and as an executive officer of pharmaceutical and biotechnology companies qualifies him to serve as a member of our Board of Directors.

**Defendant Hagan**

37.    Defendant Hagan has served as a member of Zosano's Board since May 2015. Defendant Hagan also serves as the Chair of the Audit Committee. According to the Company's 2020 Proxy Statement, as of May 11, 2020, Defendant Hagan beneficially owned 18,941 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 11, 2020 was $0.888, Defendant Hagan owned nearly $17,000 worth of Zosano stock.

38.    For the fiscal year ended December 31, 2019, Defendant Hagan received $57,893 in compensation from the Company. This included $55,000 in fees earned or paid in cash and $2,893 in option awards. For the fiscal year ended December 31, 2018, Defendant Hagan received $160,014 in compensation from the Company. This included $55,000 in fees earned or paid in

cash and $105,014 in option awards. For the fiscal year ended December 31, 2017, Defendant

Hagan received $45,000 in compensation from the Company.

39.    The Company's 2020 Proxy Statement stated the following about Defendant

Hagan:

> **Joseph "Jay" P. Hagan** has served as a member of our Board of Directors since
> May 2015. Mr. Hagan has served as Chief Executive Officer of Regulus
> Therapeutics Inc., a publicly-held clinical-stage biopharmaceutical company, since
> May 2017. Previously, he served as Regulus's Chief Operating Officer, Principal
> Financial Officer and Principal Accounting Officer since January 2016. From 2011
> to December 2015, Mr. Hagan served as Orexigen Therapeutics, Inc.'s Chief
> Business & Financial Officer. From May 2009 to June 2011, Mr. Hagan served as
> Orexigen's Senior Vice President, Corporate Development, Strategy and
> Communications. Prior to Orexigen, Mr. Hagan worked at Amgen Inc., a publicly-
> held biopharmaceutical company, from September 1998 to April 2008, where he
> served in various senior business development roles, including founder and
> Managing Director of Amgen Ventures. Prior to starting the Amgen Ventures fund,
> Mr. Hagan was Head of Corporate Development at Amgen, leading such notable
> transactions as the acquisition of Immunex and Tularik and the spinouts of
> Novatrone and Relypsa, as well as numerous other business development efforts
> totaling over $15 billion in value. Before joining Amgen, Mr. Hagan spent five
> years in the bioengineering labs at Genzyme and Advance Tissue Sciences. He has
> served as a member of the Board of Directors of Aurinia Pharmaceuticals, Inc., a
> publicly-held clinical stage biopharmaceutical company, since February 2018, and
> a member of the Board of Directors of Regulus since June 2017. Mr. Hagan
> received a B.S. in Physiology and Neuroscience from the University of California,
> San Diego and a M.B.A from Northwestern University. We believe that Mr.
> Hagan's education and professional background in science and business
> management, and his work as a senior executive in the biotechnology industry
> qualify him to serve as a member of our Board of Directors.

**Defendant Xanthopoulos**

40.    Defendant Xanthopoulos has served as a member of the Company's Board since

April 2013. Defendant Xanthopoulos also serves as Chair of the Compensation Committee.

According to the 2020 Proxy Statement, as of May 11, 2020, Defendant Xanthopoulos beneficially

owned 21,148 shares of the Company's common stock. Given that the price per share of the

Company's common stock at the close of trading on May 11, 2020 was $0.888, Defendant

Xanthopoulos owned almost $19,000 worth of Zosano stock.

41.     For the fiscal year ended December 31, 2019, Defendant Xanthopoulos received $54,893 in compensation from the Company. This included $52,000 in fees earned or paid in cash and $2,893 in option awards. For the fiscal year ended December 31, 2018, Defendant Xanthopoulos received $157,014 in compensation from the Company. This included $52,000 in fees earned or paid in cash and $105,014 in option awards. For the fiscal year ended December 31, 2017, Defendant Xanthopoulos received $42,000 in compensation from the Company.

42.     The Company's 2020 Proxy Statement stated the following about Defendant Xanthopoulos:

> ***Kleanthis G. Xanthopoulos, Ph.D***. has served as a member of our Board of Directors since April 2013. Dr. Xanthopoulos is a serial entrepreneur whose passion is building healthcare companies focused on innovation. Dr. Xanthopoulos has over two decades of experience in the biotechnology and pharmaceutical research industries as an executive, company founder, chief executive officer, investor and board member. He has founded three companies, has introduced two life science companies to Nasdaq and has brokered numerous creative strategic alliance and partnership deals with large pharmaceutical partners. Dr. Xanthopoulos has served as the President and CEO of IRRAS AB, a commercial stage medical device and drug delivery company, since June 2015 and has served as Managing General Partner at Cerus DMCC since August 2015, which focuses on investing and building innovative biotechnology companies. Dr. Xanthopoulos served as President and Chief Executive Officer of Regulus Therapeutics Inc. (Nasdaq: RGLS) from the time of its formation in 2007 until June 2015. Prior to that, he was a managing director of Enterprise Partners Venture Capital. Dr. Xanthopoulos co-founded and served as President and Chief Executive Officer of Anadys Pharmaceuticals, Inc. (Nasdaq: ANDS) from its inception in 2000 to 2006 and remained a Director until its acquisition by Roche in 2011. He was Vice President at Aurora Biosciences (acquired by Vertex Pharmaceuticals, Inc.) from 1997 to 2000. Dr. Xanthopoulos participated in The Human Genome Project as a Section Head of the National Human Genome Research Institute from 1995 to 1997. Prior to this, Dr. Xanthopoulos was an Associate Professor at the Karolinska Institute, in Stockholm, Sweden, after completing a Postdoctoral Research Fellowship at The Rockefeller University, New York. An Onassis Foundation scholar, he was named the E&Y Entrepreneur of the year in 2006 in San Diego and the San Diego Business Journal's Most Admired mid-size company CEO in 2013. Dr. Xanthopoulos received his B.Sc. in Biology with honors from Aristotle University of Thessaloniki, Greece, and received both his M.Sc. in Microbiology and Ph.D. in Molecular Biology from the University of Stockholm, Sweden. In addition to his roles at IRRAS AB, Dr. Xanthopoulos is a director of LDO S.p.a.

(Milan, Italy), and is the co-founder and a member of the Board of Directors of privately held Sente Inc. We believe that Dr. Xanthopoulos's senior executive experience managing and developing a major biotechnology company and his extensive industry knowledge and leadership experience in the biotechnology industry qualify him to serve as a member of our Board of Directors.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

43.     By reason of their positions as officers, directors, and/or fiduciaries of Zosano and because of their ability to control the business and corporate affairs of Zosano, the Individual Defendants owed Zosano and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Zosano in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Zosano and its shareholders so as to benefit all shareholders equally.

44.     Each director and officer of the Company owes to Zosano and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

45.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Zosano, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

46.     To discharge their duties, the officers and directors of Zosano were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

47.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The

conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Zosano, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Zosano's Board at all relevant times.

48.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

49.     To discharge their duties, the officers and directors of Zosano were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Zosano were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Zosano's own Code of Ethics (the "Code of Ethics");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Zosano conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Zosano and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Zosano's operations would comply with all applicable laws and Zosano's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

50.    Each of the Individual Defendants further owed to Zosano and the shareholders the duty of loyalty requiring that each favor Zosano's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

51.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Zosano and were at all times acting within the course and scope of such agency.

52.    Because of their advisory, executive, managerial, and directorial positions with Zosano, each of the Individual Defendants had access to adverse, non-public information about the Company.

53.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Zosano.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

54.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

55.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants'

violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

56.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Zosano was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

57.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

58.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Zosano, and was at all times acting within the course and scope of such agency.

## ZOSANO'S CODE OF ETHICS

59.     Zosano's Code of Ethics provides that it is intended "to reaffirm and foster the ethical climate" of Zosano, "and to provide basic guidelines for action in situations in which ethical issues arise." The Code of Ethics further provides that, "[e]ach employee of the Company, including all officers of the Company, whether or not such officer is formally employed by the Company, is responsible for the observance of this Code of Ethics." Further, "[i]f an employee becomes aware that another employee has violated this Code of Ethics, he or she is obligated to report the violation[.]"

60.     In a section titled, "General Statement of Zosano's Business Philosophy," the Code of Ethics states the following:

> Zosano's success is founded in part on its strong commitment to its staff and its corporate values that include: Excellence, Integrity and Accountability. These values are reflected in our daily operations and in the way the staff conducts themselves. Zosano's employees are expected to be individually accountable, and to perform their work with excellence and integrity while contributing to the team.

61.     In a section titled, "Conflicts of Interest," the Code of Ethics states the following, in relevant part:

> Situations in which an employee has personal interests that are incompatible with the interests of the Company should be avoided. The Company expects integrity from all its employees. The Company expects that no employee will knowingly place themselves in a position that would be, or have the appearance of being, in conflict with the interests of the Company. Conflicts of interest may not always be clear-cut, so employees with questions should consult with a member of the Ethics Committee

62.     In a section titled, "Compliance with Laws," the Code of Ethics states that "[i]t is the policy of the Company to comply with all applicable laws, including, without limitation . . . securities . . . laws." Further, the same section provides that:

> Company employees should conduct their business affairs in such a manner that the Company's reputation will not be impugned if the details of their dealings should become a matter of public discussion. Employees must not engage in any

20

activity that degrades the reputation or integrity of the Company. No director or employee of the Company has authority to violate any law or to direct another employee or other person to violate any law on behalf of the Company.

We strive to do business with companies of sound business character and reputation. We do not knowingly support any public or private organization that espouses illegal discriminatory policies or practices.

63.     In a section titled "Maintenance of Books and Records," the Company stated in the

Code of Ethics:

The Company requires honest and accurate recording and reporting of information in order to make responsible business decisions. The Company has adopted record keeping procedures to assist it in meeting its internal needs and the requirements of applicable laws and regulations. These established procedures must be followed to assure the complete and accurate recording of all transactions. All employees, within their areas of responsibility, are expected to adhere to these procedures, as directed by appropriate Company officers. For example, business expenses must be documented and recorded accurately. If you are not sure whether a certain expense is legitimate, you should consult the Employee Handbook and other applicable Company policies. All transactions involving Company assets should be properly recorded. Unrecorded or "off the books" funds, assets or payments should never be maintained or made.

64.     Further, in a section titled "Duties of Chief Executive Officer, Chief Financial

Officer and Senior Financial Personnel," the Code of Ethics states:

This Code of Ethics is intended and designed to promote full, fair, accurate, timely and understandable disclosure in the Company's public filings and other communications. The Company's chief executive officer ("CEO"), President and all senior financial personnel, including the chief financial officer ("CFO") and Controller, hold an especially important and elevated role in corporate governance. They are vested with both the responsibility and authority to protect, balance, and preserve the interests of all of the Company's stakeholders, including stockholders, clients, employees, suppliers, and citizens of the communities in which business is conducted.

65.     In violation of the Code of Ethics, the Individual Defendants conducted little, if

any, oversight of the Individual Defendants' scheme to issue materially false and misleading

statements to the public, and to facilitate and disguise the Individual Defendants' violations of law,

including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and aiding and abetting thereof. Also in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

66.     Zosano is a commercially focused biopharmaceutical company based in Fremont California. The Company markets a proprietary intracutaneous delivery system (a patch), which has an array of tiny needles that are coated in a drug, and is placed on top of the skin. The patch purportedly allows a drug (the Company's formulation of another company's drug that has already been approved by the FDA) coated on top of the patch to quickly dissolve and absorb into the bloodstream.

67.     The Company's lead product candidate—and the focus of its development efforts— is Qtrypta (also known as, "M207"). Qtrypta is a patch that contains the Company's own formulation of zolmitriptan, a migraine treatment. Indeed, Zosano described Qtrypta development and commercialization as one of the key elements of its growth strategy.

68.     The pivotal trial of Qtrypta to analyze its efficacy started in July 2016.

69.     The clinical trial, called ZOTRIP, compared three doses of Qtrypta to a placebo. Typically, the FDA takes about 10 months to review molecular entities that are not considered novel, and Zosano projected that its NDA would be reviewed within that time frame—by October 20, 2020. Significantly, until the FDA approves Qtrypta, Zosano cannot begin to commercially

produce it, nor sell the product. Thus, projections regarding Qtrypta's commercial viability were highly material to investors.

70.     As Zosano itself has admitted, however, the development and commercialization of migraine treatments, as well as drug delivery systems like Zosano's patch, is highly competitive.

**False and Misleading Statements**

***February 13, 2017 8-K and Press Release***

71.     On February 13, 2017, the Company issued a press release which was also attached to a current report filed with the SEC on a Form 8-K signed by then-interim Chief Financial Officer ("CFO"), Georgia Erbez ("Erbez"), the same day, announcing the results of its M207 clinical study. The press release stated, in relevant part:

> Zosano Pharma Corporation (NASDAQ:ZSAN) announces that its lead product candidate, M207, achieved both co-primary endpoints of pain freedom and most bothersome symptom freedom at 2 hours in the recently completed ZOTRIP trial. The ZOTRIP pivotal efficacy study was a multicenter, double-blind, randomized, placebo-controlled, dose-ranging trial comparing three doses (1.0mg, 1.9mg and 3.8mg) of M207, a novel transdermal therapeutic, to placebo for a single migraine attack. A total of 589 subjects were enrolled at 36 sites across the US. The 3.8mg dose achieved significance in the secondary endpoints of pain freedom at 45 minutes and 1 hour and showed durability of effect on pain freedom at 24 and 48 hours. Additionally, M207 was not associated with any Serious Adverse Events (SAEs).

> The 3.8mg dose of M207 achieved statistical significance for both co-primary endpoints at two hours[.]
>
>       *    *    *
>
> Furthermore, secondary endpoints measuring pain freedom at additional time points for the 3.8mg dose of M207 showed M207 superior to placebo with a nominal p- value less than 0.05[.]
>
>       *    *    *
>
> Overall, higher pain freedom rates were achieved on all doses after 60 minutes over placebo. While the 1.0mg and 1.9mg doses of M207 produced p-values less than 0.05 in pain freedom at two hours, they did not produce a p-value below 0.05 for the co- primary endpoint of freedom from most bothersome symptom at two hours.

72.     The press release further quoted Defendant Alataris, who stated that: "ZOTRIP was designed to be a dose-ranging study, as well as a registration study. We are very pleased by the results for the 3.8mg dose, and look forward to continuing the development of M207 towards filing an NDA and working to bring this novel therapy to patients suffering from the incapacitating effects of migraines[.]"

**_March 1, 2017 Form 10-K_**

73.     On March 1, 2017, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 10-K").[3] The 2016 10-K was signed by non-parties Erbez, Bruce Steel ("Steel"), and Troy Wilson ("Wilson"), and Defendants Alataris, Hagan, Walker, and Xanthopoulos, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Erbez and Defendant Alataris, attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

74.     Zosano explained that the study of Qtrypta was an important part of the process, and that certain missteps could delay the approval of the drug. The Company stated, in relevant part:

> **_The long-term safety study for M207 is an important next step in the development of M207. If we cannot raise capital, manufacture supply for the safety study, launch the safety study in a timely manner, enroll subjects, or produce results that satisfy FDA requirements, the regulatory approval process could be delayed and our business could be adversely affected._**
>
> After receiving positive results from our ZOTRIP Phase 2/3 efficacy trial of M207, the next step in the regulatory approval process is to prepare, initiate, and complete a long-term safety study. We plan to initiate this study in the second half of 2017. To conduct this safety study, we will need to raise additional capital to fund the

---

[3] Zosano filed an amendment to the 2017 10-K on March 6, 2017.

manufacture sufficient supply of M207, launch the study, and enroll subjects in the study. There are no assurances that such additional capital will be available to us on terms that are favorable to us or our existing stockholders or at all. The study will also need to produce results that satisfy FDA requirements. Any failure or setback in completing any of these required steps could require us to delay, limit, reduce or terminate our development of M207. Also, even though we have discussed our development strategy with the FDA on our M207 program and received feedback from the FDA about the size and the length of the safety study, the FDA may decide to expand on the requirements that have already been provided to us, which would further delay the regulatory approval process.

### May 9, 2017 8-K and Press Release

75.     On May 9, 2017, the Company issued a press release which was also attached to a current report filed with the SEC on a Form 8-K signed by Erbez the same day, announcing financial results for the first quarter of 2017. The press release stated, in relevant part:

> "The first quarter saw our lead product candidate meet both co-primary endpoints in ZOTRIP, our pivotal efficacy study of M207 as an acute treatment for migraine. In addition, the company completed a follow-on offering that resulted in $29.3 million in gross proceeds earmarked for advancing M207 towards FDA approval. These two important accomplishments are a result of the commitment and capabilities of Zosano's management team and gives me great confidence in our ability to continue to meet the strategic milestones established by the company."

76.     Further, the press release stated:

> "The pivotal study results importantly validate our technology platform, and, if approved by the FDA, point to M207's positioning as an acute treatment for migraine sufferers that is differentiated from what is currently available. I look forward to working with the team at Zosano and to bringing this exciting new drug to market."

77.     The press release explained that with the Company having achieved certain results in the ZOTRIP trial, the FDA had indicated that it would need one pivotal efficacy study and a safety study for Qtrypta to be approved. The press release stated, in relevant part:

**Pivotal Study Results / Status**

In February, the Company announced statistically significant results from the ZOTRIP trial, which demonstrated that the 3.8mg dose of M207 met both co-primary endpoints, achieving pain freedom and most bothersome symptom

freedom at 2 hours. The 3.8mg dose achieved a p value of <0.05 in the secondary endpoints of pain freedom at 45 minutes and 1 hour, and showed durability of effect on pain freedom to 24 and 48 hours. These results demonstrated that M207 not only provided fast onset but also a durability of effect, up to 2 days and hence freedom from recurrence of migraine. Additionally, M207 demonstrated a similar safety profile as other triptans and no Serious Adverse Events (SAEs) were reported in the trial.

The FDA has indicated that a single, positive, pivotal efficacy study, in addition to a safety study of M207, will be sufficient to file for approval under a 505(b)(2) pathway. The Company plans to initiate the safety study in the second half of 2017.

***June 26, 2017 Press Release***

78.   On June 26, 2017, the Company issued a press release announcing that it had completed its Phase 2 meetings with the FDA about ZOTRIP. The press release stated, in relevant part:

- **Confirmation of previously announced design of Long-term Safety Study**

- **Recently completed ZOTRIP study acknowledged sufficient for NDA filing**

- **CMC development strategy confirmed adequate for registration**

FREMONT, Calif., June 26, 2017 (GLOBE NEWSWIRE) -- Zosano Pharma Inc. (NASDAQ:ZSAN) ("Zosano" or the "Company") a clinical stage biopharmaceutical company focused on providing rapid systemic administration of therapeutics to patients using our proprietary ADAM technology, today announced receipt of final minutes from recent End of Phase 2 meetings with the U.S. Food and Drug Administration (FDA). The focus of this meeting was to confirm three key elements to the continued development of Zosano's lead program, M207 as an acute treatment for migraine:

- Confirmation of a single, positive Efficacy Study Sufficient for NDA filing – Zosano received confirmation that a single efficacy study, our recently completed ZOTRIP trial, is sufficient to support an NDA filing for M207. Final determination of whether sufficient efficacy has been achieved remains subject to an NDA submission and formal FDA review of the data from the ZOTRIP trial.

- Design of Long-term Safety Study – FDA confirmed the previously announced design of the Long-term Safety Study as sufficient to support an NDA filing for M207. The trial will evaluate the safety of repeat dosing of M207 in migraine patients, evaluating 150 patients to six months and 50

patients to a year. It is anticipated that patients will use M207 a minimum of twice per month. The primary emphasis will be on confirming skin tolerability during a year of dosing.

• Chemistry, Manufacturing and Controls – In a separate, concurrent communication, Zosano presented its proposed CMC development plan to the FDA. The FDA concurred that the development strategy, which conforms to relevant regulatory guidelines, appears adequate for registration of M207. CMC approval remains subject to NDA submission and FDA formal review and successful site inspections.

79.    The press release represented these meetings with the FDA as a key step in the

process, and explained that the Company would begin its safety study in the third quarter of 2017:

"We are pleased with the collaborative end-of-Phase 2 meetings with FDA that enabled us to receive detailed guidance regarding the further development of M207 and advancing towards an NDA filing," said Don Kellerman, Zosano's Vice President, Clinical Development and Medical Affairs. "This meeting represents the completion of another important milestone for M207, and we look forward to initiating our Long-term Safety Study in the third quarter of 2017, as previously announced."

80.    The press release further described the encouraging results of the M207 study,

stating as follows:

M207 is designed to rapidly deliver zolmitriptan during a migraine attack utilizing Zosano's proprietary Adhesive Dermally-Applied Microarray, or ADAM technology. Zosano's ADAM technology consists of titanium microprojections coated with drug, and in the case of M207, our formulation of zolmitriptan. Our ADAM technology delivers zolmitriptan by abrading the stratum corneum and allowing drug to be absorbed into the microcapillary system of the skin.

As previously reported, the 3.8mg dose of M207 achieved both co-primary endpoints of pain freedom and most bothersome symptom freedom at 2 hours. In addition, the 3.8mg dose achieved significance in the secondary endpoints of pain freedom at 45 minutes and 1 hour and showed durability of effect on pain freedom at 24 and 48 hours. 41.5% of the patients treated with the 3.8mg dose of M207 achieved pain freedom at 2 hours, and the effect also appeared to be durable, with 31.7% and 26.8% of patients achieving sustained pain freedom from 2-24 hours and 2-48 hours, respectively. In post-hoc analyses, M207 also demonstrated efficacy in traditionally difficult to treat established migraine headaches, as evidenced by a nearly identical therapeutic gain in those who treated prior to and after 2 hours. Additionally, 44% of patients who awoke with their migraine headache were pain free at 2 hours. Patients in this trial were instructed not to treat

27

until their headache reached moderate to severe intensity, and the mean time from headache onset to treatment was almost 5 hours. M207 was well-tolerated with no SAEs. Overall, 13 subjects (3.9%) reported pain at the application site; application site pain was reported as mild in all but 3 subjects. The most frequently reported adverse event was redness at the application site (18.3% of subjects). All cases of redness resolved. Additionally, 5 (1.5%) patients across M207-treated groups reported dizziness vs 0% on placebo.

***March 12, 2018 Form 10-K***

81.     On March 12, 2018, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K"). The 2017 10-K was signed by non-parties Erbez and Wilson, and Defendants Walker,  Greathouse, Hagan, and Xanthopoulos, and contained SOX certifications signed by Erbez and Defendant Walker, attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

82.     The 2017 10-K contained generalized risk disclosures that if the FDA decided the Company's product candidates did not meet the requirements for regulatory approval, or if there were unexpected requirements, approval would take longer and cost more, or might not be successful at all. The 2017 10-K stated, in relevant part:

> ***If the FDA does not conclude that our product candidates satisfy the requirements for the 505(b)(2) regulatory approval pathway, or if the requirements for approval of any of our product candidates under Section 505(b)(2) are not as we expect, the approval pathway for our product candidates will likely take significantly longer, cost significantly more and encounter significantly greater complications and risks than anticipated, and in any case may not be successful.***
>
> We intend to seek FDA approval through the 505(b)(2) regulatory pathway for each of our product candidates described in this Annual Report on Form 10-K. The Drug Price Competition and Patent Term Restoration Act of 1984, also known as the Hatch-Waxman Act, added Section 505(b)(2) to the Federal Food, Drug and Cosmetic Act ("FDCA"). Section 505(b)(2) permits the filing of an NDA where at

least some of the information required for approval comes from studies that were not conducted by or for the applicant.

If the FDA does not allow us or any partner with which we collaborate to pursue the 505(b)(2) regulatory pathway for our product candidates, we or they may need to conduct additional clinical trials, provide additional data and information and meet additional standards for regulatory approval. If this were to occur, we or they will need to successfully complete additional Phase 2 and/or Phase 3 clinical trials and submit to the FDA for approval one or more NDAs in order to obtain FDA approval to market each of our product candidates. The time and financial resources required to obtain FDA approval for our product candidates would likely substantially increase. The conduct of later-stage clinical trials and the submission of a successful NDA is a complicated process. To date, we have conducted only one Phase 2/3 clinical trial and have initiated a long-term safety study of M207, we have limited experience in preparing and submitting regulatory filings, and we have not previously submitted an NDA for any product candidate. Consequently, we may be unable to successfully and efficiently execute and complete necessary clinical trials in a way that leads to an NDA submission for M207 or for any other product candidates we may develop in the future.

83.     The 2017 10-K further explained that this *potentially* meant that Zosano's competitors would reach the market first, impacting its own position in the market:

Moreover, the inability to pursue the 505(b)(2) regulatory pathway could result in new competitive products reaching the market faster than our product candidates, which could materially adversely impact our competitive position and prospects. Even if we are allowed to pursue the 505(b)(2) regulatory pathway for a product candidate, we cannot assure you that we will receive the requisite approvals for commercialization of such product candidate.

In addition, our competitors may file petitions with the FDA in an attempt to persuade the FDA that our product candidates, or the clinical studies that support their approval, contain deficiencies. Such actions by our competitors could delay or even prevent the FDA from approving any NDA that we submit under Section 505(b)(2).

### *April 30, 2018 Proxy Statement*

84.     On April 30, 2018, the Company filed the 2018 Proxy Statement. Non-party Wilson and Defendants Walker, Greathouse Hagan, and Xanthopoulos solicited the 2018 Proxy

Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[4]

85.     The 2018 Proxy Statement called for, among other things: (1) the election of Defendant Walker; (2) approval of two amendments to the Company's Amended and Restated 2014 Equity and Incentive Plan (the "2014 Equity and Incentive Plan"), including to increase the number of shares issuable thereunder; and (3) the ratification of the Company's independent auditor.

86.     With respect to the Company's Code of Ethics, the 2018 Proxy Statement stated that it applies "to [its] directors, executive officers and employees."

87.     The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Ethics was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Ethics.

88.     The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including "individual performance as compared to [the Company's] expectations and objectives, [and its] desire to motivate [its] employees to achieve short- and long-term results that are in the best interests of [the] stockholders," while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

---

[4] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

89.     The 2018 Proxy Statement was materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose to investors, *inter alia*, that: (1) the Company's clinical results showed that subjects who received different lots of zolmitriptan had different exposure levels; (2) the Qtrypta NDA reflected that certain patients in the clinical studies had unexpected high plasma concentrations of zolmitriptan; (3) because of these variances in patient results, the FDA was reasonably likely to require further studies of Qtrypta, which would delay regulatory approval of the drug; and (4) the Company failed to maintain internal controls. As a result of the foregoing, Zosano's public statements were materially false and misleading at all relevant times.

90.     The misrepresentations and omissions set forth herein were material to shareholders in voting on, among other things, electing a director and increasing the number of shares issuable under the Company's 2014 Equity and Incentive Plan.

### October 23, 2018 Press Release

91.     On October 23, 2018, the Company issued a press release announcing that "150 evaluable subjects have completed their six month visit in the M207-ADAM study . . . , a long-term, open-label safety study for the acute treatment of migraine." The press release stated, in relevant part:

> No unexpected safety signals have been identified during the first six months of the trial and there have been no study drug related serious adverse events. The total number of investigator reported adverse events, with 4,000 applications to date, is 625 of which 232 are reported as skin site reactions and 120 triptan related adverse events. The remainder of the adverse events (273) include nasal congestion, gastrointestinal disorders, appetite suppression, respiratory tract infections and insomnia, among others. Efficacy parameters, while observational in the context of this open label safety study, continue to remain similar to the data from the pivotal

ZOTRIP trial. The rate of pain freedom at two hours following patch application is approximately 43% and most bothersome symptom freedom is approximately 68%, while pain relief at two hours post treatment is reported at 81% of migraine attacks treated.

### *February 21, 2019 Press Release*

92.     On February 21, 2019, Zosano issued a press release announcing the results of the

Qtrypta long term safety study. The press release stated, in relevant part:

> • **Long-term one-year dosing reaffirmed well-tolerated safety profile**
>
> • **Qtrypta showed robust and rapid relief of migraine pain, an effect that was consistent throughout the chronic treatment period**
>
> • **NDA submission expected in Q4 2019 for the first intracutaneous delivery system**

FREMONT, Calif., Feb. 21, 2019 (GLOBE NEWSWIRE) -- Zosano Pharma Corporation (NASDAQ:ZSAN), a clinical-stage biopharmaceutical company, today announced the completion of the second and final goal of the long-term safety study for Qtrypta, in which patients treated migraine attacks over a one year period. The long-term data generated in this trial reinforced the well-tolerated safety profile and strong efficacy results previously reported in the six-month dosing portion of this safety study and in the randomized Phase 2/3 ZOTRIP pivotal study. Throughout the clinical program, over 5,800 migraine attacks have been treated with Qtrypta to date.

93.     The press release further stated:

The Qtrypta long-term safety trial is an open-label study evaluating the safety of the 3.8 mg dose of intracutaneous zolmitriptan in adults with migraine who have historically experienced at least 2 migraine attacks per month. There were no maximum treatment limits. The study evaluated over 150 adults with migraine disease for six months, and more than 50 patients for a year at 31 sites in the U.S.

Of more than 5,800 migraines treated, investigators reported 832 adverse events, of which 298 were reported as application site reactions and 161 were reported as triptan related adverse events.

Observational efficacy parameters continued to demonstrate a rate of pain freedom at two hours following patch application of approximately 44% and most bothersome symptom freedom of approximately 68%, while pain relief at two hours was reported at 81% of migraine attacks treated.

**March 25, 2019 Form 10-K**

94.     On March 25, 2019, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by non-parties Wilson and then-CFO Gregory Kitchener ("Kitchener"), and Defendants Walker, Elms, Grais, Greathouse, Hagan, and Xanthopoulos, and contained SOX certifications signed by Defendant Walker and non-party Kitchener, attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

95.     Zosano again warned in the 2018 10-K that if it could not produce satisfactory results in the safety study of Qtrypta, FDA approval could be delayed. The Company stated, in relevant part:

> **The long-term safety study for QtryptaTM (M207) is an important step in the development of QtryptaTM (M207). If we cannot produce results that satisfy FDA requirements, the regulatory approval process could be delayed, and our business could be adversely affected.**
>
> In February 2019, we announced the completion of the final phase of our long-term safety study where more than 50 evaluable subjects were treated for a year. This long-term safety study will need to produce results that satisfy FDA requirements. If the results do not satisfy the FDA's requirements it could require us to delay, limit, reduce or terminate our development of QtryptaTM (M207). Also, even though we have discussed our development strategy with the FDA on our QtryptaTM (M207) program and received feedback from the FDA about the size and the length of the safety study, the FDA may decide to expand on the requirements that have already been provided to us, which would further delay the regulatory approval process and require additional clinical work.
>
> **If the FDA does not conclude that our product candidate satisfies the requirements for the 505(b)(2) regulatory approval pathway, or if the requirements for approval of our product candidate under Section 505(b)(2) are not as we expect, the approval pathway for our product candidate will likely take significantly longer, cost significantly more and encounter significantly greater complications and risks than anticipated, and in any case may not be successful.**

We intend to seek FDA approval through the 505(b)(2) regulatory pathway for our product candidate described in this Annual Report on Form 10-K. The Drug Price Competition and Patent Term Restoration Act of 1984, also known as the Hatch-Waxman Act, added Section 505(b)(2) to the FDCA. Section 505(b)(2) permits the filing of an NDA where at least some of the information required for approval comes from studies that were not conducted by or for the applicant.

If the FDA does not allow us or any partner with which we collaborate to pursue the 505(b)(2) regulatory pathway for our product candidate, we or they may need to conduct additional clinical trials, provide additional data and information and meet additional standards for regulatory approval. If this were to occur, we or they will need to successfully complete additional Phase 2 and/or Phase 3 clinical trials and submit to the FDA for approval one or more NDAs in order to obtain FDA approval to market our product candidate. The time and financial resources required to obtain FDA approval for our product candidate would likely substantially increase. The conduct of later-stage clinical trials and the submission of a successful NDA is a complicated process. To date, we have conducted only one Phase 2/3 clinical trial and have initiated a long-term safety study of QtryptaTM (M207), we have limited experience in preparing and submitting regulatory filings, and we have not previously submitted an NDA for any product candidate. Consequently, we may be unable to successfully and efficiently execute and complete necessary clinical trials in a way that leads to an NDA submission for QtryptaTM (M207) or for any other product candidate we may develop in the future.

Moreover, the inability to pursue the 505(b)(2) regulatory pathway could result in new competitive products reaching the market faster than our product candidate, which could materially adversely impact our competitive position and prospects. Even if we are allowed to pursue the 505(b)(2) regulatory pathway for a product candidate, we cannot assure you that we will receive the requisite approvals for commercialization of such product candidate.

In addition, our competitors may file petitions with the FDA in an attempt to persuade the FDA that our product candidate, or the clinical studies that support their approval, contain deficiencies. Such actions by our competitors could delay or even prevent the FDA from approving any NDA that we submit under Section 505(b)(2).

### *June 4, 2019 Proxy Statement*

96.     On June 4, 2019, the Company filed its Schedule 14A with the SEC (the "2019 Proxy Statement"). Defendants Walker, Elms, Grais, Greathouse, Hagan, and Xanthopoulos

solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[5]

97.     The 2019 Proxy Statement called for, among other things: (1) the election of Defendants Elms and Greathouse; and (2) the ratification of the Company's independent auditor.

98.     With respect to the Company's Code of Ethics, the 2019 Proxy Statement stated that it applies "to [its] employees, officers and directors[.]"

99.     The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Ethics was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Ethics.

100.     The Individual Defendants also caused the 2019 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including "individual performance as compared to [the Company's] expectations and objectives, [and its] desire to motivate [its] employees to achieve short- and long-term results that are in the best interests of [the] stockholders," while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

101.     The 2019 Proxy Statement was materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company

---

[5] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

to make false and misleading statements to the investing public that failed to disclose to investors, *inter alia*, that: (1) the Company's clinical results showed that subjects who received different lots of zolmitriptan had different exposure levels; (2) the Qtrypta NDA reflected that certain patients in the clinical studies had unexpected high plasma concentrations of zolmitriptan; (3) because of these variances in patient results, the FDA was reasonably likely to require further studies of Qtrypta, which would delay regulatory approval of the drug; and (4) the Company failed to maintain internal controls. As a result of the foregoing, Zosano's public statements were materially false and misleading at all relevant times.

102.    The misrepresentations and omissions set forth herein were material to shareholders in voting on, among other things, the election of certain directors and ratification of the Company's independent auditor.

### *November 13, 2019 Press Release*

103.    On November 13, 2019, Zosano issued a press release announcing that it had completed pre-NDA meetings with the FDA for Qtrypta:

> Zosano Pharma Corporation (NASDAQ:ZSAN), a clinical-stage biopharmaceutical company, today announced that it has received minutes from pre- New Drug Application ("NDA") meetings with the Food and Drug Administration ("FDA") for the acute treatment of migraine for Qtrypta. ***The purpose of the meetings was to confirm the completion of all requisite studies, as well as the proposed clinical, non-clinical, and chemistry, manufacturing, and controls ("CMC") content and format of the company's NDA submission, which the company expects to make in December 2019.***
>
> ***"We are encouraged by the pre-NDA minutes received from FDA after our collaborative meetings.*** This is an important milestone as we head into the final stages of completion of the NDA," said Hayley Lewis, Senior Vice President, Operations. "These minutes reflect discussions made between Zosano and FDA on the format and content of the NDA to help ensure all elements of submission are met."
>
> The company was granted two separate pre-NDA meetings to discuss the development program. A face to face meeting was held with the FDA in September

to discuss the nonclinical and clinical portions of the program. *A second pre-NDA meeting request was granted to discuss CMC, and FDA recently provided its written responses to the company's questions in lieu of holding an in-person meeting.* Based on the feedback from the FDA, the company believes the information included in its planned NDA will be sufficient for the FDA to file the NDA for substantive review.

(Emphasis added.)

### November 14, 2019 Form 8-K and Press Release

104.    On November 14, 2019, the Company issued a press release which was also attached to its Form 8-K signed by Kitchener and filed with the SEC the same day, announcing financial results for the third quarter of 2019 and providing an update. The press release quoted Defendant Lo, who stated in relevant part:

> "These next twelve months will be transformational for Zosano. We are finalizing our New Drug Application for Qtrypta for the acute treatment of migraine, which we expect to file with the FDA by the end of the year. If approved, Qtrypta would be the first transdermal therapy for migraine, and we believe would represent a significant advance in the treatment options available to patients. *Our extensive clinical data demonstrate that Qtrypta provides fast-acting and sustained pain freedom with less of the side effects typically experienced with other therapies in this class.* Given the debilitating and prevalent nature of migraines, we are inspired by the need to better serve these patients."

(Emphasis added.)

### December 23, 2019 Press Release and Form 8-K

105.    On December 23, 2019, the Company issued a press release announcing that it had submitted an NDA for Qtrypta to the FDA. The press release stated, in relevant part:

> "Our NDA submission represents a significant milestone for Zosano and a culmination of our efforts to make Qtrypta available to patients who suffer from migraine. In clinical trials, Qtrypta demonstrated robust freedom from pain and most bothersome symptom, rapid and sustained pain relief, and was well tolerated," said Steven Lo, president and chief executive officer of Zosano. "Qtrypta is the first NDA to be submitted to the FDA for a pharmaceutical microneedle application, and we look forward to working with the FDA during the review process. If successful, the approval would signal the validity of this product as a convenient, non-oral therapy for acute migraine sufferers, in addition to providing important validation of our delivery technology itself. We believe that Qtrypta, if approved,

can make an important difference in the lives of patients who require acute treatment options for their migraine."

Based on the Company's NDA submission on Friday, December 20, 2019, the company expects to receive notification from the FDA confirming whether the submission was accepted for filing for substantive review in March 2020.

The submission is supported by the results of the ZOTRIP pivotal Phase 2/3 clinical study, in which 41.5% of patients treated with the 3.8 mg dose of Qtrypta achieved pain freedom at 2 hours and 68.3% reported freedom from most bothersome symptom at 2 hours, both of which were co-primary endpoints. Additionally, 80.5% of patients reported pain relief at 2 hours, a secondary endpoint. The results of the study were published in Cephalalgia in October 2017.

A post-hoc analysis showing that Qtrypta reduced pain in subjects with difficult to treat migraines was published in Headache: The Journal of Head and Face Pain in February 2019.

Additionally, in the Phase 3 safety study, the most frequently reported adverse events were redness and swelling at the application site. Of these, 95% were reported as mild, and more than 80% resolved within 48 hours. Less than 2% of patients reported triptan-like neurological side effects typically found in the class, such as dizziness and paresthesia.

106.    The same day, Zosano also filed a current report with the SEC on Form 8-K signed by non-party Kitchener. The 8-K announced the submission of the NDA and included the same projections and descriptions of ZOTRIP as stated in the press release.

### March 4, 2020 Form 8-K and Press Release

107.    On March 4, 2020, Zosano issued a press release which was also attached to its Form 8-K signed by interim CFO Christine Matthews ("Matthews") and filed with the SEC the same day. The press release stated, in relevant part:

The NDA is supported by the clinical results of the ZOTRIP pivotal Phase 2/3 clinical study, which evaluated the efficacy, safety and tolerability of Qtrypta™ compared to placebo. A total of 41.5% of patients treated with the 3.8 mg dose of Qtrypta™ achieved pain freedom at 2 hours and 68.3% reported freedom from most bothersome symptom also at 2 hours, both of which were co-primary endpoints. Additionally, 80.5% of patients reported pain relief at 2 hours, a secondary endpoint. The results of the study were published in *Cephalalgia* in October 2017.

A post-hoc analysis showing that Qtrypta™ reduced pain in subjects with difficult to treat migraine attacks was published in *Headache: The Journal of Head and Face Pain* in February 2019.

Additionally, in the Phase 3 long term safety study, the most frequently reported adverse event was redness at the application site. Of these adverse events, 95% were reported as mild, and more than 80% resolved within 48 hours. Less than 2% of patients reported triptan-like neurological side effects typically found in the class, such as dizziness and paresthesia.

### March 13, 2020 Form 10-K

108.    On March 13, 2020 the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2019 (the "2019 10-K"). The 2019 10-K was signed by non-party Matthews, and Defendants Lo, Walker, Elms, Grais, Greathouse, Hagan, and Xanthopoulos, and contained SOX certifications signed by Matthews and Defendant Lo, attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

109.    The 2019 10-K again provided generic warnings that if Zosano's product candidates did not satisfy the FDA's requirements, regulatory approval could be delayed, or unsuccessful, stating, in relevant part:

> *If the FDA does not conclude that our product candidates satisfy the requirements for the 505(b)(2) regulatory approval pathway, or if the requirements for approval of our product candidates under Section 505(b)(2) are not as we expect, the approval pathway for our product candidates will likely take significantly longer, cost significantly more and encounter significantly greater complications and risks than anticipated, and in any case may not be successful.*

> We intend to seek FDA approval through the 505(b)(2) regulatory pathway for our product candidates described in this Annual Report on Form 10-K. The Drug Price Competition and Patent Term Restoration Act of 1984, also known as the Hatch-Waxman Act, added Section 505(b)(2) to the Federal Food, Drug and Cosmetics Act ("FDCA"). Section 505(b)(2) permits the filing of a New Drug Application ("NDA") where at least some of the information required for approval comes from studies that were not conducted by or for the applicant.

If the FDA does not allow us or any partner with which we collaborate to pursue the 505(b)(2) regulatory pathway for our product candidates, we or they may need to conduct additional clinical trials, provide additional data and information and meet additional standards for regulatory approval. If this were to occur, we or they will need to successfully complete additional Phase 2 and/or Phase 3 clinical trials and submit to the FDA for approval one or more NDAs in order to obtain FDA approval to market our product candidates. The time and financial resources required to obtain FDA approval for our product candidates would likely substantially increase. The conduct of later-stage clinical trials and the submission of a successful NDA is a complicated process. To date, we have conducted only one Phase 2/3 clinical trial and one LTSS of Qtrypta™ (M207). In addition, we have limited experience in preparing and submitting regulatory filings, and we have not previously submitted an NDA for any product candidates. Consequently, the completion of our clinical trials for Qtrypta™ (M207) for the potential treatment of migraine may not lead to an NDA submission and we may be unable to successfully and efficiently execute and complete necessary clinical trials in a way that leads to an NDA submission for any other product candidate we may develop in the future.

Moreover, the inability to pursue the 505(b)(2) regulatory pathway could result in new competitive products reaching the market faster than our product candidates, which could materially adversely impact our competitive position and prospects. Even if we are allowed to pursue the 505(b)(2) regulatory pathway for our product candidates, we cannot assure you that we will receive the requisite approvals for commercialization of such product candidates.

In addition, our competitors may file petitions with the FDA in an attempt to persuade the FDA that our product candidates, or the clinical studies that support their approval, contain deficiencies. Such actions by our competitors could delay or even prevent the FDA from approving any NDA that we submit under Section 505(b)(2).

***May 29, 2020 Proxy Statement***

110.   On May 29, 2020, the Company filed the 2020 Proxy Statement. Defendants Walker, Elms, Grais, Greathouse, and Hagan solicited 2020 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[6]

---

[6] Plaintiff's allegations with respect to the misleading statements in the 2020 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

111.    The 2020 Proxy Statement also called for, among other things: (1) the election of Defendants Lo, Hagan, and Xanthopoulos; and (2) the ratification of the Company's independent auditor.

112.    With respect to the Company's Code of Ethics, the 2020 Proxy Statement stated that it "applies to [its] directors, executive officers and employees[.]"

113.    The 2020 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Ethics was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Ethics.

114.    The Individual Defendants also caused the 2020 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including "individual performance and near-term corporate targets as well as long-term business objectives," while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

115.    The 2020 Proxy Statement was materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose to investors, *inter alia*, that: (1) the Company's clinical results showed that subjects who received different lots of zolmitriptan had different exposure levels; (2) the Qtrypta NDA reflected that certain patients in the clinical studies had unexpected high plasma concentrations of zolmitriptan; (3) because of these variances in patient results, the FDA was reasonably likely to require further studies of Qtrypta, which would delay regulatory approval of the drug; and (4) the Company failed to

maintain internal controls. As a result of the foregoing, Zosano's public statements were materially false and misleading at all relevant times.

116.    The misrepresentations and omissions set forth herein were material to shareholders in voting on the 2020 Proxy Statement.

117.    The statements referenced in ¶¶71-83, 91-95, and 103-09, herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose to investors, *inter alia*, that: (1) the Company's clinical results showed that subjects who received different lots of zolmitriptan had different exposure levels; (2) the Qtrypta NDA reflected that certain patients in the clinical studies had unexpected high plasma concentrations of zolmitriptan; (3) because of these variances in patient results, the FDA was reasonably likely to require further studies of Qtrypta, which would delay regulatory approval of the drug; and (4) the Company failed to maintain internal controls. As a result of the foregoing, Zosano's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

118.    The truth emerged after the markets closed on September 30, 2020, when Zosano issued a press release which was also attached to its Form 8-K signed by Matthews and filed with the SEC the same day. Zosano disclosed in the press release that it had received a DRL from the FDA regarding its NDA for Qtrypta and that approval was unlikely due to the FDA's concerns. The press release stated, in relevant part:

> The DRL described two concerns with respect to the clinical pharmacology section of the NDA. First, the FDA raised questions regarding unexpected high plasma concentrations of zolmitriptan observed in five study subjects from two pharmacokinetic studies, and how the data from these subjects affect the overall

clinical pharmacology section of the application. Second, the FDA raised questions regarding differences in zolmitriptan exposures observed between subjects receiving different lots of Qtrypta in the Company's clinical trials.

Although a DRL reflects preliminary comments that are subject to change, and does not reflect the FDA's final decision on the NDA, approval of Qtrypta by the Prescription Drug User Fee Act goal date of October 20, 2020 is not expected given the letter.

119.    On this news, the price of the Company's stock fell $0.92 per share, or almost 57%, from $1.62 per share at the close of trading on September 30, 2020, to $0.70 per share at the close of the next trading day, on October 1, 2020, on unusually heavy trading volume.

120.    Then, on October 21, 2020, Zosano disclosed that it had received a CRL from the FDA. Based on deficiencies it had already identified, the FDA recommended that Zosano repeat its bioequivalence study between three of the lots used during development.

121.    On this news, the Company's share price fell $0.171 per share, or almost 28%, from $0.615 per share at the close of trading on October 20, 2020, to close at $0.444 per share at the close of the next trading day, on October 21, 2020, on unusually heavy trading volume

## DAMAGES TO ZOSANO

122.    As a direct and proximate result of the Individual Defendants' conduct, Zosano will lose and expend many millions of dollars.

123.    Such expenditures include, but are not limited to, costs associated with the Securities Class Actions filed against the Company, its CEO, Chairman, and former CEO, and any internal investigations and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

124.    Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

125.    As a direct and proximate result of the Individual Defendants' conduct, Zosano has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

126.    Plaintiff brings this action derivatively and for the benefit of Zosano to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Zosano, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, as well as the aiding and abetting thereof.

127.    Zosano is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

128.    Plaintiff is, and has been at all relevant times, a shareholder of Zosano. Plaintiff will adequately and fairly represent the interests of Zosano in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

129.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

130.    A pre-suit demand on the Board of Zosano is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following seven individuals: Defendants Lo, Walker, Elms, Grais, Greathouse, Hagan, and Xanthopoulos (the "Directors"). Plaintiff needs

only to allege demand futility as to four of the seven Directors who were on the Board at the time of the filing of this complaint.

131.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material fact, which renders the Directors unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

132.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

133.    Demand is also excused because pursuant to the 2018 Proxy Statement, Defendants Walker, Greathouse, Hagan, and Xanthopoulos requested shareholders to approve, through amending and restating, a plan to increase the number of shares reserved for their own benefit. These financial incentives precluded the Directors from acting in the best interests of the shareholders, as they could not simultaneously request approval of the amendment to the 2014 Equity Incentive Plan while also failing to provide shareholders with information in the 2018 Proxy Statement regarding the true state of the Company. Thus, their solicitations, which they materially benefitted from, and the resulting approval of their proposal was based on materially

false and misleading statements. Defendants Walker, Greathouse, Hagan, and Xanthopoulos are thus conflicted from considering a demand against them based on these circumstances as well.

134.    Demand is also excused as to the Directors because they were fully aware of the fact that regulatory approval of Qtrypta was reasonably likely to be delayed during the Relevant Period. In particular, Defendants Lo, Walker, Elms, Grais, Greathouse, and Hagan all held positions at biopharmaceutical companies. Their specialized experience provided them with insight into the regulatory approval process, as well as the risks thereof. Nonetheless, the Directors caused the Company to disseminate the false and misleading statements described herein. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

135.    Additional reasons that demand on Defendant Lo is futile follow. Defendant Lo has served as the Company's President and CEO and as a Company director since October 2019. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Lo with his principal occupation, and he receives handsome compensation, including $874,638 during 2019 for his services. Defendant Lo signed, and thus personally made the false and misleading statements in the 2019 10-K. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Lo is a defendant in the Securities Class Actions. For these reasons, Defendant Lo breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

136.    Additional reasons that demand on Defendant Walker is futile follow. Defendant Walker served as Zosano's President and CEO from August 2017 until October 20, 2019, and

provided transition services until his retirement on November 10, 2019. He has served as a member

of the Board since May 2016 and as the Chairman of the Board since May 4, 2016.Thus, as the

Company admits, he is a non-independent director. As a trusted Company director, who previously

held the Company's highest office, he conducted little, if any, oversight of the scheme to cause the

Company to make false and misleading statements, consciously disregarded his duties to monitor

such controls over reporting and engagement in the scheme, and consciously disregarded his duties

to protect corporate assets. Furthermore, Defendant Walker signed, and thus personally made the

false and misleading statements in the 2016, 2017, 2018, and 2019 10-Ks. Moreover, Defendant

Walker is a defendant in the Securities Class Actions. For these reasons, Defendant Walker

breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or

disinterested, and thus demand upon him is futile and, therefore, excused.

137.    Additional reasons that demand on Defendant Elms is futile follow. Defendant

Elms has served as a member of Zosano's Board since May 2018. Defendant Elms has received

and continues to receive compensation for his role as a director as described above. As a trusted

Company director, he conducted little, if any, oversight of the scheme to cause the Company to

make false and misleading statements, consciously disregarded his duties to monitor such controls

over reporting and engagement in the scheme, and consciously disregarded his duties to protect

corporate assets. Furthermore, Defendant Elms signed, and thus personally made the false and

misleading statements in the 2018 and 2019 10-Ks. For these reasons, Defendant Elms breached

his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested,

and thus demand upon him is futile and, therefore, excused.

138.    Additional reasons that demand on Defendant Grais is futile follow. Defendant

Grais has served as a member of the Company's Board since January 2019. Defendant Grais has

47

received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Grais signed, and thus personally made the false and misleading statements in the 2018 and 2019 10-Ks. For these reasons, Defendant Grais breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

139.    Additional reasons that demand on Defendant Greathouse is futile follow. Defendant Greathouse has served as a member of the Company's Board since October 2017. Defendant Greathouse has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Greathouse signed, and thus personally made the false and misleading statements in the 2017, 2018, and 2019 10-Ks. For these reasons, Defendant Greathouse breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

140.    Additional reasons that demand on Defendant Hagan is futile follow. Defendant Hagan has served as a member of Zosano's Board since May 2015. Defendant Hagan has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to

make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Hagan signed, and thus personally made the false and misleading statements in the 2016, 2017, 2018, and 2019 10-Ks. For these reasons, Defendant Hagan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

141.    Additional reasons that demand on Defendant Xanthopoulos is futile follow. Defendant Xanthopoulos is has served as a member of the Company's Board since April 2013. Defendant Xanthopoulos has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Xanthopoulos signed, and thus personally made the false and misleading statements in the 2016, 2017, 2018, and 2019 10-Ks. For these reasons, Defendant Xanthopoulos breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

142.    Additional reasons that demand on the Board is futile follow.

143.    The Directors have extensive, longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, Defendant Elms is the Managing Partner of investment firm Aisling Capital IV, LP ("Aisling"), which holds over 5% of Zosano's common stock and is one of its largest investors. In April 2019, Zosano issued 5,000,000

shares of common stock, of which Aisling purchased 428,571 shares. Zosano also issued 2,181,034 shares of common stock in a direct offering in December 2019, of which Aisling purchased 689,655 shares. Thus, Defendant Elms had an interest in maintaining the inflation of Zosano's stock price for the benefit of Aisling. Moreover, he was beholden to the Individual Defendants who approved or were involved in his beneficial relationship with the Company.  These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

144.    Defendants Hagan, Grais, and Greathouse (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the Company's quality and integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the Company's financial reporting process, and the Company's internal controls over financial reporting. The Audit Committee Defendants failed to ensure the quality and integrity of the Company's financial statements, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC and to fail to maintain internal controls. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

145.    In violation of the Code of Ethics, the Directors conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control,

waste of corporate assets, unjust enrichment, and violations of the Exchange Act. In violation of the Code of Ethics, the Directors failed to comply with laws and regulations, maintain the accuracy of company records, public reports and communications, and uphold the responsibilities related thereto. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

146.    Zosano has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Zosano any part of the damages Zosano suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

147.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

148.    The acts complained of herein constitute violations of fiduciary duties owed by Zosano's officers and directors, and these acts are incapable of ratification.

149.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Zosano. If there is a directors' and officers' liability

insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Zosano, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

150.    If there is no directors' and officers' liability insurance, then the Directors will not cause Zosano to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

151.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

152.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

153.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any

proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

154.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

155.    Under the direction and watch of the Directors, the 2018, 2019, and 2020 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia*, that: (1) the Company's clinical results showed that subjects who received different lots of zolmitriptan had different exposure levels; (2) the Qtrypta NDA reflected that certain patients in the clinical studies had unexpected high plasma concentrations of zolmitriptan; (3) because of these variances in patient results, the FDA was reasonably likely to require further studies of Qtrypta, which would delay regulatory approval of the drug; and (4) the Company failed to maintain internal controls. As a result of the foregoing, Zosano's public statements were materially false and misleading at all relevant times.

156.    The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

157.    Moreover, the Proxy Statements were false and misleading when they discussed the Company's adherence to specific governance policies and procedures, including the Code of

Ethics, due to the Individual Defendants' failures to abide by them and their causing the Company to issue false and misleading statements and/or omissions of material fact.

158.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to, election of directors, ratification of the Company's independent auditor, and the approval of the amendment of the 2014 Equity and Incentive Plan.

159.    The false and misleading elements of the Proxy Statements led to the election of Defendants Lo, Walker, Elms, Greathouse, Hagan, and Xanthopoulos as directors, which allowed them to continue breaching their fiduciary duties to Zosano.

160.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

161.    Plaintiff on behalf of Zosano has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

162.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

163.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Zosano's business and affairs.

164.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

165.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Zosano.

166.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

167.    In breach of their fiduciary duties owed to Zosano, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that:(1) the Company's clinical results showed that subjects who received different lots of zolmitriptan had different exposure levels; (2) the Qtrypta NDA reflected that certain patients in the clinical studies had unexpected high plasma concentrations of zolmitriptan; (3) because of these variances in patient results, the FDA was reasonably likely to require further studies of Qtrypta, which would delay regulatory approval of the drug; and (4) the Company failed to maintain internal controls. As a result of the foregoing, Zosano's public statements were materially false and misleading at all relevant times.

168.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact.

169.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were

available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Zosano's securities.

170.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Zosano's securities.

171.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

172.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Zosano has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

173.    Plaintiff on behalf of Zosano has no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants for Unjust Enrichment**

174.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

175.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Zosano.

176. The Individual Defendants either benefitted financially from the improper conduct tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Zosano that was tied to the performance or artificially inflated valuation of Zosano, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

177. Plaintiff, as a shareholder and representative of Zosano, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

178. Plaintiff on behalf of Zosano has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

179. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

180. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Zosano, for which they are legally responsible.

181. As a direct and proximate result of the Individual Defendants' abuse of control, Zosano has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Zosano has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

182. Plaintiff on behalf of Zosano has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

183.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

184.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Zosano in a manner consistent with the operations of a publicly-held corporation.

185.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Zosano has sustained and will continue to sustain significant damages.

186.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

187.    Plaintiff on behalf of Zosano has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

188.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

189.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

190.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

191.    Plaintiff on behalf of Zosano has no adequate remedy at law.

## SEVENTH CLAIM

### Against Defendants Lo, Walker, and Alataris for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

192.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

193.    Zosano, along with Defendants Lo, Walker, and Alataris are named as defendants in the Securities Class Actions, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Lo, Walker, and Alataris' willful and/or reckless violations of their obligations as officers and/or directors of Zosano.

194.    Defendants Lo, Walker, and Alataris, because of their positions of control and authority as officers and/or directors of Zosano, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Zosano, including the wrongful acts complained of herein and in the Securities Class Actions.

195.    Accordingly, Defendants Lo, Walker, and Alataris are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

196.    As such, Zosano is entitled to receive all appropriate contribution or indemnification from Defendants Lo, Walker, and Alataris.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Zosano, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Zosano;

(c)    Determining and awarding to Zosano the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Zosano and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Zosano and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Zosano to nominate at least four candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Zosano restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

Dated: February 9, 2021                    Respectfully submitted,

                                           **FARNAN LLP**

                                           /s/ Michael J. Farnan
                                           Brian E. Farnan (Bar No. 4089)
                                           Michael J. Farnan (Bar No. 5165)
                                           919 N. Market St., 12th Floor
                                           Wilmington, DE 19801
                                           Telephone: (302) 777-0300
                                           Facsimile: (302) 777-0301
                                           Email: bfarnan@farnanlaw.com
                                                   mfarnan@farnanlaw.com

Of Counsel:

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com